IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>[4] DAVID CASTRO-LEE, A/K/A "EL COREANO"<br><br>Defendant. | CRIMINAL NO.: 22-311 (RAM) |

**REPORT & RECOMMENDATION**

I.  **INTRODUCTION**

On July 7, 2022, the United States of America (the "Government") presented a criminal complaint against five individuals, including Mr. David Castro-Lee ("Defendant"), alleging violations of possession with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine and conspiracy to commit the same under 21 U.S.C. §§ 841, 846. ECF No. 1 at 1. The court authorized the complaint as to all defendants except Mr. Gordon W. González-Foster. ECF No. 1 at 1. Thereafter, on July 13, 2022, a grand jury returned an indictment against the same individuals accused in the criminal complaint except Mr. González-Foster, charging them with, while aiding and abetting each other, knowingly and intentionally possessing with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(ii)(II) and 18 U.S.C. § 2. ECF No. 32 at 1–2. Pending before the court is Defendant's motion to dismiss the indictment and suppress evidence, arguing that his arrest was unlawful, and anything seized afterward was fruit of the poisonous tree. ECF No. 99 at 1. Among the post arrest matters that Defendant wants to exclude from the evidence at trial are statements made during and after his

arrest; the consent form allowing law enforcement to search his phone; and his phone, including its contents. Hr'g, December 13, 2023, at 9:35–9:38 a.m. The Government opposes Defendant's request for dismissal and suppression. ECF No. 103. A suppression hearing was held on December 13, 2023. ECF No. 136. At the inception of the hearing, both parties stipulated that Defendant was under arrest before he signed a waiver form authorizing law enforcement to search his phone and before said phone was searched. Hr'g, December 13, 2023, at 9:38, 9:44 a.m.

**II.   FACTUAL BACKGROUND**

On July 6, 2022, Customs and Border Protection ("CBP") spotted a vessel of interest off the shore of Vieques, Puerto Rico. CBP contacted the Puerto Rico Police Bureau ("PRPB") to assist in case the vessel approached shore. Sergeant Freddy García Quiñones ("Sgt. García"), Officer Ángel Márquez ("Officer Márquez"), and Officer Pedro Echevarría responded to the call and first went to Esperanza Pier. While at Esperanza, Sgt. García heard sounds of boats with two types of engines. Afterward, the officers moved to Sun Bay Beach, approximately less than a five-minute drive away from Esperanza. Hr'g, December 13, 2023, at 9:48–9:58 a.m., 10:10 a.m.

As the officers entered Sun Bay in their patrol vehicles, they observed a white van approaching them near the entrance. Once the officers intercepted the white van, one individual was immediately apprehended and at least one other fled into nearby shrubbery. The officers then searched the white van and discovered several bales of cocaine. ECF Nos. 137-5–7. While doing so, the officers noticed a vehicle with its headlights on approaching them from the rear of the white van. Sgt. García explained that the unknown vehicle turned off its headlights and began reversing outside the view of law enforcement. Deeming this occurrence suspicious, Sgt. García and Officer Márquez entered a patrol vehicle and drove in the direction of the vehicle.

After driving for about three minutes, Sgt. García and Agent Márquez discovered a Mitsubishi Montero turned off and parked near a wooded area. Sgt. García touched the vehicle's hood and felt that it was warm, consistent with the fact that the Montero was the same vehicle spotted approaching the white van. After conducting a cursory search around the Montero's immediate area, no person was found around the vehicle. Next, Sgt. García began trying to open the Montero's doors, and as he attempted to open the driver's side door, the Montero's alarm went off. Subsequently, in response to the Montero's alarm, Defendant and Mr. González-Foster emerged from the wooded area. The officers, with weapons drawn pointed near the ground, instructed Defendant and Mr. González-Foster to get on their knees with their hands on their heads to which they complied; however, Defendant and Mr. González-Foster were not handcuffed at this moment.[1] While Defendant and Mr. González-Foster were still on their knees, the officers conducted a brief pat down of their waists in search of weapons. During this interaction, Defendant and Mr. González-Foster explained that they had done nothing wrong and were merely crab fishing. Hr'g, December 13, 2023, at 10:13–10:16 a.m., 11:34–11:36 a.m., 12:00–12:06 p.m.

Afterwards, Defendant confirmed that the Montero was his and had no objection to police searching it. The officers then searched the Montero and observed that the vehicle was wet and sandy but had no equipment indicating that the gentlemen were in fact crab fishing. According to Sgt. García, the gentlemen could not have been crab fishing because they did not have the equipment typically used for said pursuit, such as a cage, bucket, or net. On the other hand, according to Mr. González-Foster, the men could easily catch crabs with simply their bare hands because crabs were at the time in season. Thereafter, the police officers arrested Defendant and

---

[1] According to Sgt. García, Defendant and Mr. González were ordered to stay on their knees for approximately one to two minutes. Hr'g, December 13, 2023, at 11:53 a.m.

Mr. González-Foster, handcuffed them, read them their *Miranda* rights, and searched them. Sgt. García further testified that, upon searching Defendant, officers uncovered his cell phone. According to Mr. González-Foster's testimony, however, Defendant had left his cell phone in the Montero and upon searching the Montero, the officers found the phone before Defendant and Mr. González-Foster approached them beyond the wooded area. Hr'g, December 13, 2023, at 10:55–11:02 a.m., 3:05 p.m., 3:09–3:16 p.m.

After their arrest, both Defendant and Mr. González-Foster were temporarily taken to a police station in Vieques before being transferred to federal authorities in Ceiba, Puerto Rico. While in Ceiba, and still being under arrest, Defendant was read his *Miranda* rights, signed a *Miranda* form noting that he explicitly refused to answer questions, and signed a consent form for the search of his cellular phone that was earlier seized. ECF Nos. 137-1–3. Drug Enforcement Agency Task Force Officer ("DEA TFO") Peter Kalme, one of the officers who had administered both forms, acknowledged that although both forms were administered around the same time, he could not remember which form exactly was executed first. Following the execution of both forms, the Government searched Defendant's phone where it found evidence suggesting that he was conducting counter surveillance for the drug operation. Hr'g, December 13, 2023, at 1:54–2:01 p.m., 3:20 p.m.

### III.   ANALYSIS

Defendant contends that his warrantless arrest was made in violation of the Fourth Amendment because it was made without probable cause and therefore anything seized thereafter must be excluded as fruit of the poisonous tree. ECF No. 99 at 4–5. The Government responds by arguing that the arrest was lawful and that it had Defendant's valid consent to search his phone. ECF No. 103 at 4-5. Even if all factual disputes were resolved in favor of the

4

Government, Defendant's arrest would still be unlawful, and the evidence sought to be suppressed is fruit of the poisonous tree. Therefore, the following analysis will be made taking the Government's version of the facts as true.

    **A.  Whether the evidence should be suppressed.**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Davis v. United States*, 564 U.S. 229, 234–35 (2011). Arrests are seizures under the Fourth Amendment, and therefore must also be reasonable. *See Payton v. New York*, 445 U.S. 573, 585 (1980). Thus, in the case of an arrest for drug trafficking, the reasonableness of the arrest depends on whether an officer with authority to make a warrantless arrest had probable cause to believe that the person arrested was involved in the drug trafficking operation. *See Bailey v. United States*, 568 U.S. 186, 192 (2013). "[P]robable cause exists when an officer, acting upon apparently trustworthy information, reasonably can conclude that a crime has been . . . committed and that the suspect is implicated in its commission." *United States v. Flores*, 888 F.3d 537, 543 (1st Cir. 2018) (quoting *Morelli v. Webster*, 552 F.3d 12, 21 (1st Cir. 2009)).

"To determine whether an officer had probable cause to make an arrest, [a court must] examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696, (1996)). "[P]robable cause is not a creature of certainty and does not require either the level of proof needed to secure a conviction or even an 'unusually high degree of assurance.'" *United States v. Centeno-González*, 989 F.3d 36, 45 (1st Cir. 2021) (quoting *United States v. Clark*, 685 F.3d 72, 76 (1st Cir. 2012)). Rather, an officer's conclusion that probable

cause exists requires only objective reasonableness. *Acosta v. Ames Dep't Stores, Inc.*, 386 F.3d 5, 11 (1st Cir. 2004) (quoting *United States v. Winchenbach*, 197 F.3d 548, 555–56 (1st Cir. 1999)).

Here, at the time of Defendant's arrest, the arresting officers knew the following: cocaine was being transported inside a van at a place not too distant from where Defendant and Mr. González-Foster were found; Defendant and Mr. González-Foster were found in the morning hours while it was still dark outside; Defendant's Montero was seen reversing with its lights off and away from PRPB officers investigating the white van; Defendant and Mr. González-Foster lied about crab fishing in the area; Defendant was wearing water clothes; and the Montero was found to be wet and sandy. Hr'g, December 13, 2023, at 3:57–3:59 p.m. However, these facts taken together do not rise to the level of probable cause.

First, it is well settled that "[m]ere proximity to a criminal act does not establish probable cause; the police must show some additional circumstances from which it is reasonable to infer participation in criminal activity." *Robinson v. Cook*, 706 F.3d 25, 36 (1st Cir. 2013) (citing *United States v. Martínez–Molina*, 64 F.3d 719, 726 (1st Cir. 1995). Second, even if Defendant and Mr. González-Foster lied to police as to whether they were crab fishing, that is not necessarily indicative of the fact that they were participating in a drug trafficking operation because individuals can have many alternate reasons to lie to police. Third, water clothes do not conclusively indicate that Defendant was participating in a drug operation because Defendant was at a beach, somewhere where it is common to wear such type of clothing. Fourth, while an argument could be made that the sand and wetness inside the Montero links it to the cocaine found inside the van, it is just as likely that the Montero was wet and sandy because Defendant and Mr. González-Foster were at a beach.

Fifth, even though officers allegedly observed the Montero suspiciously reverse away from them near the white van and in the early morning hours, while relevant as to guilt, this alone is not enough to establish probable cause that Defendant was involved in the drug operation. *Coggins v. Cnty. of Nassau*, 254 F. Supp. 3d 500 (E.D.N.Y. 2017) ("Without more . . . a suspect's attempt to flee the scene is not sufficient to establish probable cause."); *United States v. Davis*, 458 F.2d 819 (D.C. Cir. 1972) ("Although flight has been a legitimate factor in a finding of probable cause, . . . it has not been considered a 'reliable indicator of guilt without other circumstances to make its import less ambiguous.'" (citation omitted)). At most, this only gave the officers reasonable suspicion to investigate the Montero, temporarily stop the gentlemen, and gather more information. *Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000) (holding that police had reasonable suspicion to conduct a stop when suspect, upon noticing police, fled from a high-crime area). Finally, Sgt. García testified that at the time Defendant was arrested, no offense had been committed:

> Q. [Defense Counsel] And at that point in time you had nothing in your mind that [Defendant] had committed an offense when you took the phone, isn't that right?
>
> A. [Sgt. García] At the moment he had not committed an offense, but he was in an area which was being worked on.

Hr'g, December 13, 2023, at 11:51–11:52 a.m.

Additionally, the evidence linking Defendant to the drug operation compared to the evidence linking Mr. González-Foster to the drug operation prior to their arrest is not materially different. The only difference before they were arrested between Defendant and Mr. González-Foster is that Defendant owned and drove the Montero, while Mr. González-Foster was a passenger in the Montero. Hr'g, December 13, 2023, at 3:06 p.m. The contents of the phone, while relevant to the charge, cannot be considered in the probable cause to arrest analysis

7

because that analysis considers only those events occurring before the arrest. The Government has conceded that Defendant was arrested before he gave consent to search his phone and his phone was searched:

> Q. Is it the position of the United States that the Defendant was already under arrest when he was asked whether he consented . . . to the search of his phone?
>
> A. Yes, your Honor. The Government admits that he was under custody when consent was requested to search his phone.
>
> Q. Would it be fair . . . to say that there is no dispute between the parties that before the Defendant was asked for his consent to search the phone, he was already under arrest?
>
> A. That is accurate.

Hr'g, December 13, 2023, at 9:44–9:45 a.m.

In other words, at the time of Defendant's arrest, the arresting officers had no knowledge of the contents on Defendant's phone. Therefore, the Government cannot now retroactively use the phone's contents to justify Defendant's arrest. As explained above, in reviewing the criminal complaint, the court found that there was no cause to arrest Mr. González-Foster, and because both Defendant and Mr. González-Foster's circumstances leading up to their arrest, though not identical, are factually similar, Defendant's arrest was also made without probable cause. The facts that Defendant owned the Montero, drove the Montero, and that a phone was found on his person do not in and of themselves materially distinguish the circumstances between Defendant and Mr. González-Foster as to whether there was probable cause for an arrest. Thus, like Mr. González-Foster, Defendant's arrest was without probable cause and was therefore unlawful.

"[T]he indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality." *New York v. Harris*, 495 U.S. 14, 19 (1990) (citation omitted). Or, put otherwise, "[t]he question whether evidence obtained after an

illegal search should be suppressed" depends on whether "'the evidence to which . . . objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *United States v. Finucan*, 708 F.2d 838, 843 (1st Cir. 1983) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488, (1963)).

In considering whether the indirect fruits of law enforcement's unlawful action should be suppressed, courts consider several factors. The Supreme Court has noted that "[n]o single fact is dispositive," but that "temporal proximity[,] . . . the presence of intervening circumstances, . . . and . . . the purpose and flagrancy of the official misconduct are all relevant" to the taint inquiry (the "*Brown* factors"). *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975). And, where, as here, an earlier unlawful arrest is alleged to have tainted consent that is given later, courts have "emphasized the importance of determining whether the prior illegality 'significantly influenced' or 'played a significant role' in the subsequent consent." *United States v. Cordero-Rosario*, 786 F.3d 64, 76 (1st Cir. 2015) (citations omitted).

Here, the contents within Defendant's phone, Defendant's consent to search his phone, and Defendant's statements made after the arrest were fruit of the unlawful arrest because of their close temporal relationship with the unlawful arrest, independent means do not exist suggesting that the evidence would have been uncovered despite the unlawful arrest, and Defendant was under continuous custody leading up to the search of his phone. First, the seizure of Defendant's phone requires no in-depth analysis of the *Brown* factors because it was seized contemporaneously with and as a direct result of his unlawful arrest, therefore making it fruit of the poisonous tree.

Second, Defendant's consent to search his phone occurred approximately four to five hours after the unlawful arrest.[2] While there is no bright-line rule to determine temporal proximity in the taint analysis, the Supreme Court has provided guidance to analyze this factor. In *Wong Sun*, in which the Supreme Court found attenuation, defendant, after being unlawfully arrested, was released on his own recognizance and, several days later, returned voluntarily to give a statement. *See Wong Sun*, 371 U.S. at 491. By contrast, in *Brown*, approximately between one to two hours separated police officers' unlawful arrest from Brown's confession. *See Brown* 422 U.S. at 592, 594. That amount of time, the Supreme Court held, was insufficient to attenuate the confession from the unlawful arrest. *Id.* at 604–05. In *Taylor v. Alabama*, the Supreme Court found that a six-hour gap between an illegal arrest and a confession was not sufficient to attenuate the taint of the arrest. *Taylor v. Alabama*, 457 U.S. 687, 691 (1982). Specifically, the Supreme Court noted that six hours is not significant where defendant "was in police custody, unrepresented by counsel, . . . questioned on several occasions, fingerprinted, and subjected to a lineup." *Id.* Just as the Supreme Court did in *Taylor*, courts also consider the conditions of a defendant's custody when determining temporal proximity. *See e.g., United States v. Stark*, 499 F.3d 72, 76 (1st Cir. 2007) (finding that confession made two days after unlawful arrest was not temporally proximate because defendant had enough time to reflect on his predicament and the conditions of detention were favorable); *United States v. Oliver*, 27 Fed. Appx. 927, 928–29 (10th Cir. 2001) (stating that statement made eleven hours after unlawful arrest was not

---

[2] While it is not clear at what exact time Defendant and Mr. González-Foster were arrested, Sgt. García began his shift at 4:00 a.m. Hr'g, December 13, 2023, at 9:52 a.m. Given the sequence of events, and acknowledging that it was dark during the summer when the individuals were arrested, it would be reasonable to infer that the arrest occurred before 6:00 a.m. Additionally, while the consent form does not have a timestamp, DEA TFO Kalme stated that the consent form was executed around the same time as the *Miranda* form, which is dated July 6, 2022, at 10:20 a.m. Hr'g, December 13, 2023, at 2:00 p.m. Therefore, the time between Defendant's arrest and the consent form is approximately four to five hours.

temporally proximate because although defendant was in police custody, "he was apparently left alone by officers" during that time).

With this framework in mind, the four to five hours between the unlawful arrest and Defendant's subsequent consent to search his phone was not enough to attenuate the consent from the unlawful arrest, especially where Defendant had been in continuous custody since the unlawful arrest without any alleviating circumstances brought to the court's attention. *Cf. United States v. Cellitti*, 387 F.3d 618, 623 (7th Cir. 2004) (finding six hours between unlawful arrest and consent to be insufficient to validate consent where "consent was given while [defendant] was still in custody because of the illegal arrest and there was no intervening event of significance."); *United States v. Christy*, No. CR 10-1534, 2011 WL 13285700, at *34 (D.N.M. May 25, 2011) ("[T]he Court finds that the approximately five hours between the illegal searches and [defendant's] confession do not weigh in favor of finding attenuation."), *on reconsideration*, 810 F. Supp. 2d 1219 (D.N.M. 2011), *aff'd*, 739 F.3d 534 (10th Cir. 2014). Therefore, the first *Brown* factor weighs in favor of suppression.

Regarding the second *Brown* factor, the Government fails to point toward any intervening events suggesting that the consent was sufficiently attenuated from the unlawful arrest. While the Government could argue that it would have acquired Defendant's consent even without the unlawful arrest because Defendant allegedly consented to the search of his vehicle before his arrest, that argument cannot prosper. Even if Defendant did consent to the search of his vehicle before his arrest, that does not automatically imply that he would have consented to the search of his phone. Due to the fact that smartphones can store the content of communications and appointments, among many other things, it would be reasonable for a person to have a greater expectation of privacy about a cell phone than a car. Moreover, the record suggests that

Defendant's unlawful arrest played a significant role in his subsequent consent because at the time consent was given, the Government had already seized the phone and Defendant was physically restrained and surrounded by officers. Hr'g, December 13, 2023, at 2:00–2:02 p.m. Therefore, the second *Brown* factor weighs in favor of suppression.

The final *Brown* factor entails an evaluation of the purpose and flagrancy of the official misconduct. "In analyzing this factor, courts look to see whether: (a) the police used threatening or abusive tactics; (b) the 'impropriety of the [initial misconduct] was obvious'; and (c) the initial [seizure] was a mere evidence expedition calculated to elicit a confession." *Stark*, 499 F.3d at 77 (quoting *Brown*, 422 U.S. at 605). Although in the case at hand, the record does not indicate that police aimed their firearms to Defendant and Mr. González-Foster like in *Brown*, 422 U.S. at 592, 605 (observing that police broke into and searched the defendant's apartment without probable cause and, upon the defendant's arrival at his apartment, pointed a gun at his head and arrested him merely for further investigation and questioning) or trespassed into the intimacy of a home like in *Wong Sun*, 371 U.S. at 474, 486 (observing that police went to the business of a man who was thought to be a heroin dealer, forcibly opened his door, followed him into his bedroom, and almost immediately handcuffed and arrested him without probable cause), Sgt. García acknowledged that he was not aware of Defendant having committed a crime prior to his arrest. Therefore, while a temporary stop and frisk might have been justified by reasonable suspicion, it should have been evident that an arrest was premature. Because the *Brown* factors weigh in favor of suppression, Defendant's consent to search his phone is fruit of the poisonous tree.

Third, for the same reasons explained above, Defendant's statements made after his arrest—to the extent that those post-arrest statements were made before Defendant invoked his

*Miranda* rights in Ceiba (ECF No. 137-1)—are also fruit of poisonous tree. Likewise, nothing in the record indicates that Defendant would have spoken with police had he not been arrested. Indeed, the record shows that Defendant only sought to speak to police near the time of his arrest to explain that he was crab fishing and that he did not seek to speak to police after his arrest as evidenced by him writing "no" next to "Are you willing to answer some questions?" on the *Miranda* form. ECF No. 137-1. In sum, Defendant's cell phone, the contents within that phone, Defendant's consent to search his phone, and Defendant's statements made after his arrest but prior to the exercise of his right to remain silent are fruits of his unlawful arrest and should therefore be suppressed.

### B. Whether the indictment should be dismissed.

Defendant argues that because his motion to suppress should be granted, the indictment against him should also be dismissed. ECF No. 99 at 1. In other words, Defendant contends that if his motion to suppress were granted, the evidence remaining against him would be insufficient to secure a conviction. However, Defendant's undeveloped argument fails to keep in perspective the framework under which a motion to dismiss should be evaluated:

> An indictment must allege each of the required elements of ... [the offense charged], but the government need not put forth specific evidence to survive a motion to dismiss. [*United States v. Stewart*, 744 F.3d 17, 21 (1st Cir. 2014)] (citing Fed.R.Crim.P. 7(c)(1)). When a defendant seeks dismissal of an indictment, courts take the facts alleged in the indictment as true, mindful that "the question is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense." *United States v. Savarese*, 686 F.3d 1, 7 (1st Cir. 2012). Indeed, "courts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations." *United States v. Guerrier*, 669 F.3d 1, 4 (1st Cir. 2011).

*United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015). Here, Defendant provides no reason as to why the allegations in the indictment are insufficient to apprise him of the charged offense. Moreover, sufficiency of the evidence is not the proper focus for a motion to dismiss.

Additionally, to the extent that Defendant asserts that his indictment should be dismissed because he was unlawfully arrested, that argument also fails:

> [T]he remedies available to a criminal defendant alleging a Fourth Amendment violation are limited to 1) suppression of evidence pursuant to the exclusionary rule and/or 2) a collateral civil rights lawsuit pursuant to 42 U.S.C. § 1983. *See, e.g., Hudson v. Michigan*, 547 U.S. 586, 591, 596–97, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) (noting that civil remedies are available for Fourth Amendment violations and the exclusionary rule (not dismissal) should be the court's "last resort"). Because the "remedy in a criminal proceeding is limited to denying the prosecution the fruits of its transgression", the circumstances of [defendant]'s [arrest] do not justify the dismissal of the indictment. *See United States v. Morrison*, 449 U.S. 361, 366, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981) ("[The Supreme Court of the United States] ha[s] not suggested that searches and seizures contrary to the Fourth Amendment warrant dismissal of the indictment.").

*United States v. Colburn*, 546 F. Supp. 3d 22, 27 (D. Mass. 2021); *see also United States v. Medearis*, 236 F. Supp. 2d 977 (D.S.D. 2002) (holding that a defendant's unlawful arrest did not warrant dismissal of the indictment). Accordingly, Defendant's motion to dismiss the indictment should be DENIED.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion to suppress (ECF No. 99) should be GRANTED. Accordingly, Defendant's cell phone, the contents within that phone, Defendant's consent to search his phone, and Defendant's statements after the arrest—to the extent detailed above—should be suppressed. Defendant's motion to dismiss the indictment (ECF No. 99), however, should be DENIED. The parties have fourteen (14) days to file any objections to this report and recommendation unless otherwise ordered by the court. Failure to file the same within the specified time waives the right to object to this report and recommendation. Fed. R. Civ. P.

72(b)(2); Fed. R. Civ. P. 6(c)(1)(B); D.P.R. Civ. R. 72(d); *see also* 28 U.S.C. § 636(b)(1); *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150–51 (1st Cir. 1994); *United States v. Valencia*, 792 F.2d 4 (1st Cir. 1986).

IT IS SO RECOMMENDED.

In San Juan, Puerto Rico, this 12th day of January, 2024.

s/Marcos E. López<br>U.S. Magistrate Judge